**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ubaldo Trujillo,<br><br>             Plaintiff,<br><br>v.<br><br>Nancy A. Berryhill,<br>Acting Commissioner of Social Security,<br><br>             Defendant. | No. CV-15-0223-TUC-BGM<br><br>**ORDER** |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 21). Defendant filed her Responsive Brief ("Response") (Doc. 22), and Plaintiff filed his Reply Brief ("Reply") (Doc. 23). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

. . .

. . .

. . .

# I.    BACKGROUND

## A.    *Procedural History*

On July 11, 2011,[1] Plaintiff filed a Title II application for Social Security Disability Insurance Benefits ("DIB"), as well as a Title XVI application for Supplemental Security Income ("SSI"), alleging disability as of April 30, 2008[2] due to headaches, anxiety, seizures, and head trauma.  *See* Administrative Record ("AR") at 11, 33–34, 72–77, 91–92, 114, 117, 187, 194, 219, 232.   Plaintiff's date last insured is December 31, 2012.  *Id.* at 11, 13, 76, 219, 228, 263, 294.   The Social Security Administration ("SSA") denied this application on November 10, 2011.  *Id.* at 11, 71–73, 108–12.   Plaintiff filed a request for reconsideration, and on January 12, 2012, SSA denied Plaintiff's application upon reconsideration.  *Id.* at 11, 74–105, 113–20.   On January 17, 2012, Plaintiff filed his request for hearing.  *Id.* at 11, 121–22.  On April 30, 2013, a hearing was held before Administrative Law Judge ("ALJ") Myriam C. Fernandez Rice.  AR at 11, 28–70.  On August 7, 2013, the ALJ issued an unfavorable decision.  *Id.* at 8–22.  On October 11, 2013, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on March 23, 2015, review was denied.  *Id.* at 1–7. On May 28, 2015, Plaintiff filed this cause of action.  Compl. (Doc. 1).

---

[1] In her opinion, the Administrative Law Judge ("ALJ") states that the claimant applied for benefits on July 11, 2011; however the various forms and summaries contained in the record are inconsistent and indicate application dates of July 11, 2011, as well as July 15, 2011.  AR at 11, 72–75, 187, 194.

[2] At the hearing before the ALJ the claimant amended his alleged onset date to January 1, 2010.  AR at 33.  The ALJ noted this change to January 20, 2010 in her decision; however, the court relies on the hearing transcript and finds January 1, 2010 to be Plaintiff's alleged onset date.  *Id*. at 11, 33.

### B. Factual History

Plaintiff was fifty-two (52) years old at the time of the administrative hearing and forty-nine (49) at the time of the alleged onset of his disability. AR at 33, 72–76, 91, 187, 194, 219, 263. Plaintiff has a ninth grade education and obtained a GED. *Id.* at 33, 72–75. Prior to his alleged disability, Plaintiff worked as a laborer, cement finisher, and floor hand. *Id.* at 33, 208–18, 222–30, 233, 277.

#### 1. Plaintiff's Testimony

#### a. Administrative Hearing

At the administrative hearing, Plaintiff testified that he is married, and his wife is on benefits. AR at 36–37. Plaintiff further testified that his wife had a stroke resulting in both mental and physical disability, and they tried to take care of one another. *Id.* at 37. Plaintiff has no other source of income. *Id.* at 36–37. Plaintiff is not supposed to drive due to his seizure condition, but does sometimes. *Id.* at 37. Plaintiff testified that he has trouble sleeping at night, and on a typical day he and his wife will read the Bible together, eat lunch, watch a movie or some television, eat supper, and get ready for bed. *Id.* at 37–38, 55. Plaintiff testified that both he and his wife do chores, such as cooking, cleaning, and grocery shopping. AR at 38. Plaintiff further testified that he cannot spend much time in a store to shop, because of his panic attacks. *Id.* at 47–49. Plaintiff testified that to accommodate this issue, he and his wife try to shop early or late in the day. *Id.* at 49. Plaintiff also testified that the few times that he and his wife have gone to see a movie, he could not comprehend what was happening on the screen. *Id.* at 50. Plaintiff testified that this happens when he watches movies or television at home, too. *Id.* at 54.

During the hearing, Plaintiff had difficulty remembering the precise title of his last job as a laborer. AR at 33–34. Plaintiff testified that he was laid off in conjunction with having a seizure while walking down the stairs at work. *Id.* at 34, 42. Plaintiff further testified that he takes seizure medication, as well as medication for depression and anxiety, and headaches. *Id.* at 35–36, 53–54, 62. Plaintiff also testified that he can no longer work as a cement finisher, because he cannot read blueprints or do the necessary calculations, cannot pay sufficient attention, and he suffers from neck and back pain. *Id.* at 38–39, 56. Plaintiff's work as a cement finisher also involved supervising approximately ten (10) to twenty (20) people. *Id.* at 64–65. Plaintiff testified that he no longer uses drugs or alcohol, but does not remember when he last used. *Id.* at 39–40.

Plaintiff further testified that his seizures had been controlled over the previous five (5) months, likely because of a change in his medication. AR at 40. Plaintiff testified that prior to that he would have seizures once or twice a week. *Id.* at 41. Plaintiff stated that he has grand mal seizures, which cause him to lose consciousness for approximately one (1) hour. *Id.* at 42–43. Plaintiff testified that having seizures at work made it so he could not do his job. *Id.* at 43. Plaintiff indicated that when he was a foreman taking breaks was a possibility; however, this is not an option for regular laborers. *Id.* at 44. Plaintiff further testified that despite the fact that his seizures are better controlled, they would still be a problem at work. AR at 45–46.

Plaintiff also testified that he also suffers from anxiety and panic attacks. *Id.* at 46–47. Plaintiff further testified that when a panic attack occurs he suffers from dizziness, sweating, and a change in breathing. *Id.* Plaintiff testified that sometimes his

panic attacks prevent him from sleeping.  *Id.* at 48, 51.  Plaintiff further testified that although the frequency of his panic attacks has been reduced by medication, they still occur.  *Id.* at 50.  Plaintiff also testified that he cannot sleep through the night, and will wake up after a couple of hours thinking that his world is going to end.  AR at 51.  Plaintiff testified that it takes a long time to go back to sleep after this occurs, and can take as long as an hour and a half to two (2) hours.  *Id.* at 52.  Plaintiff further testified that this affects his mood swings, and he often suffers from bad moods.  *Id.*  Additionally, Plaintiff described incidents at work resulting in fights, because he does not like to "take orders" from anyone.  *Id.* at 57–58.  Plaintiff also testified that he has trouble remembering things, such as conversations or activities.  *Id.* at 56–57.

Plaintiff testified that he suffers from daily headaches, but does not have a specific medication to treat them.  AR at 58–59.  Plaintiff takes Naproxen to treat both his headaches and his back.  *Id*. at 59.  Plaintiff further testified that he has had these headaches since being hit on the head with a tire iron.  *Id*. at 59–60.  Plaintiff also testified that previously some supervisors would allow him to take off from work when he had a headache, but others would be angry.  *Id*. at 60.

Plaintiff testified that his depression makes him feel like giving up.  *Id.* at 61.  Plaintiff further testified that he does not have any hobbies aside from reading the Bible, but his appetite is good.  AR at 61–62.  Plaintiff also testified that he has thought about taking his own life, and continues to have those thoughts.  *Id.* at 62.

### b. Administrative Forms

On July 20, 2011, Plaintiff completed a Function Report—Adult in this matter.

He indicated that he lived with a friend, made his bed, water to the lawn, and cleaned up. AR at 241. On the same date, Plaintiff completed a Seizure History form. *Id.* at 243–45. Plaintiff described his seizures as feeling like electricity is flowing through his head and sometimes throughout his entire body. *Id.* at 243. Plaintiff stated that he has seizures once or twice per week, but does not remember the dates of his last three (3) seizures. *Id.* Plaintiff described a shocking feeling as the warning sign before the seizure begins. *Id.* During the seizure, Plaintiff passes out, loses control of his urine, and has been told that he shakes. AR at 243. Plaintiff indicated that his seizures usually occur at night and vary in length. *Id.* Plaintiff confirmed that he stares into space for short period of time without falling or shaking, and reported feeling lost and unable to remember anything after the seizure. *Id.* Plaintiff listed several seizure medications, including Carbamazepine, clonazepam, and trazodone, and indicated that he usually takes the medication as directed. *Id.* Plaintiff noted that it has been about two (2) years since he last used alcohol or drugs. *Id.* Plaintiff also indicated that he is seeking help from a psychologist. *Id.*

Plaintiff also completed a Headache Questionnaire. AR at 246–52. Plaintiff testified that he has headaches once or twice a day that feel like the top of his head is going to explode. *Id.* at 246. Plaintiff described a sound "like a train whistle going off" occurring prior to or during the headaches, with the pain located on the top of his head and sometimes on his temples. *Id.* Plaintiff stated that he takes "lots and lots of Tylenol" and uses cold water to relieve the symptoms. *Id.* Plaintiff further indicated that stress makes the headaches worse, and they sometimes last all day. *Id.*

Plaintiff stated that he does not get along with anyone and does not like people telling him what to do. AR at 247. Plaintiff further noted his anxiety and poor ability to handle stress or changes in routine. *Id.* Plaintiff also noted that he relies on glasses or contact lenses for reading. *Id.* Plaintiff indicated that he angers easily and does not like to socialize. *Id.* at 248. Plaintiff further indicated that he cannot hear very well, his eyesight has gotten "real bad," he is forgetful, he has trouble understanding, and cannot stand being around others. *Id.* Plaintiff also stated that he was having difficulty filling out the form. AR at 248. Plaintiff testified that he can concentrate for approximately thirty (30) minutes to one (1) hour, but has difficulty following instructions. *Id.*

Plaintiff listed his previous activities as playing cards, fishing, and watching television. *Id.* at 249. Plaintiff stated that he was good at those things; however, now he loses interest quickly. *Id.* Plaintiff further stated that he speaks with his brother on the phone once a week, but does not go anywhere else on a regular basis. *Id.* Plaintiff testified that he needs to be reminded to go places, but does not need anyone to accompany him. AR at 249. Plaintiff stated that when he goes out he walks or rides in a car, but does not drive because he does not have a driver's license. *Id.* at 250.

Plaintiff further stated that he shops in stores approximately twice per month for one (1) to two (2) hours for groceries. *Id.* Plaintiff also noted that he is able to pay bills, count change, and handle a savings account; however, he cannot use a checkbook due to a lack of funds. *Id.* Plaintiff testified that he needs reminders to take his daily medication. *Id.* at 251. Plaintiff prepares his own meals once or twice a day, making mostly sandwiches. AR at 251. Plaintiff testified that this meal preparation takes him

approximately twenty (20) minutes. *Id.* Plaintiff also stated that he forgets about having the stove on. *Id.*

Regarding household chores, Plaintiff testified that he makes his bed, takes the garbage out, and waters the lawn. *Id.* Plaintiff stated he performs these tasks daily and it takes him approximately four (4) hours to complete. *Id.* Plaintiff also indicated that he does not care for other people or pets. AR at 252. Plaintiff testified that he can no longer work cement or as a laborer. *Id.* Plaintiff also stated that he has trouble sleeping, and gets a shocking feeling when he tries to go to sleep which scares him. *Id.* Plaintiff did not indicate any problems with personal care, although he has trouble remembering where he puts things. *Id.*

On December 19, 2011, Plaintiff filled out a second Seizure History form. *Id.* at 274–75. Plaintiff again described his seizures as feeling like electricity is flowing through his body, and also noted a loss of feeling in his left leg and arm and pressure in his head. AR at 274. Plaintiff noted that the frequency of his seizures vary, and could not remember the dates of his last three (3) seizures. *Id.* at 274. Plaintiff described feeling like electricity begins hitting his body prior to the onset of the seizure. *Id.* Plaintiff reported that he sometimes passes out during the seizure and sometimes loses control of his urine. *Id.* Plaintiff also stated that he was told that he shakes during the seizure. *Id.* Plaintiff further reported that the seizures occur both during the day and at night and vary in length. AR at 274. Plaintiff described feeling lost after having a seizure. *Id.* Plaintiff stated that he has used alcohol or street drugs in the past; however, does not remember the last time he used them, estimating it was approximately ten (10)

years ago.  *Id.*  Plaintiff listed two seizure medications, Carbamazepine and lamotrigine, and indicated that he always takes the medication as directed.  *Id.*  Plaintiff apologized for his inability to remember things or events, noting that his brain does not work "that great."  *Id.* at 275.  Plaintiff also stated that filling out these forms causes him a great deal of stress.  *Id.*

On the same date, Plaintiff completed a second Function Report—Adult in this matter.  AR at 287–293.  Plaintiff stated that he lived with his son.  *Id.* at 287.  Plaintiff described his daily activities as waking up; making his bed; taking a shower; sometimes eating; taking his medication; cleaning house if he is feeling well; feeding the dog; watching television; and keeping to himself.  *Id.*  Plaintiff noted that he does not care for any other people, but feeds his son's dog and gives her water.  *Id.* at 288.  Plaintiff stated that he is no longer able to work because of his illness.  *Id.*

Plaintiff described sometimes feeling jolts of electricity in his head, which affects his sleep.  *Id.*  Regarding personal care, Plaintiff stated that he is afraid of having a seizure in the shower; that it hurts to comb his hair; and that brushing his teeth sometimes gives him jolts of electricity in his head.  AR at 288.  Plaintiff indicated that he needs reminders for appointments and to take his medication.  *Id.* at 289.  Plaintiff stated that he prepares meals daily, consisting of mostly sandwiches, and taking approximately ten (10) to twenty (20) minutes to prepare.  *Id.*  Plaintiff further stated that he is scared to use the stove.  *Id.*  Plaintiff stated that he can vacuum, sweep, and mop.  *Id.*  These tasks take him approximately seven (7) hours, once per week, and he sometimes needs a reminder.  AR at 289.  Plaintiff stated that he goes outside approximately four (4) times per day.  *Id.* at

290.  Plaintiff further stated that he walks and rides in a car, but does not drive because he is afraid of having a seizure.  *Id.*  Plaintiff shops twice per month at the store for groceries, and the amount of time it takes varies.  *Id.*  Plaintiff indicates that he is unable to pay bills, count change, handle a savings account, or use a checkbook, because he does not have any money.  *Id.*

Plaintiff listed his previous activities as playing cards and watching television.  AR at 291.  Plaintiff stated that he watches television daily.  *Id.*  Plaintiff further stated that he speaks with family and attends church on Sundays.  *Id.*  Plaintiff noted that he does not need to be reminded to go places or need anyone to accompany him.  *Id.*  Plaintiff indicated that he has a bad temper and cannot work like he used to.  *Id.* at 292.

Plaintiff described his illness as affecting his ability to lift; stand; walk; sit; talk; see; remember; concentrate; understand; follow instructions; and get along with others.  AR at 292.  Plaintiff stated that he can walk approximately 500 yards before needing to stop and rest, and requires approximately ten (10) minutes of rest before he can resume walking.  *Id.*  Plaintiff indicated that he does not know how long he can pay attention, but sometimes can finish what he starts.  *Id.*  Plaintiff stated that he does not get along well with authority figures, and has been fired or laid off from a job because of problems with getting along with other people and not liking to be told what to do.  *Id.* at 293.  Plaintiff does not handle stress or changes in routine well, and suffers from anxiety.  *Id.*  Plaintiff stated that he does not currently use any assistive devices, but could use a cane.  AR at 293.

. . .

## 2. Vocational Expert Cornelius Ford's Testimony

Mr. Cornelius J. Ford testified as a vocational expert at the administrative hearing. AR at 20, 63. Mr. Ford described Plaintiff's past work as a mining laborer, Dictionary of Occupational Titles ("DOT") number 921.667-018, as heavy exertion, and a Specific Vocational Preparation ("SVP") of 2, unskilled. *Id.* at 65. Mr. Ford described Plaintiff's other past work as a floor hand, DOT number 939.687-018, as a very heavy exertional level, SVP of 1, unskilled. *Id.* Mr. Ford described Plaintiff's third past work position as a cement mason, DOT number 869.664-014, as a heavy exertion level, SVP of 4, semi-skilled. *Id.*

The ALJ asked Mr. Ford about a hypothetical individual with the same age, education, and vocational background as Plaintiff. *Id.* The ALJ asked Mr. Ford to describe any past work or other work for such an individual, with the additional limitations of "not climb[ing] ladders, ropes or scaffolds; avoid[ing] all exposure to unprotected heights; . . . [and] limited to simple, routine repetitive tasks, only occasional interaction with the public and coworkers; . . . not [working] in an isolated work area; his interaction would be to be [sic] occasional but he should not be in a place where he's completely by himself[.]" *Id.* at 65–66. The ALJ further refined her hypothetical to request work in either the heavy or medium exertional level. AR at 66. Mr. Ford testified that such an individual would be able to do the job of laundry worker, DOT number 361.684-014, medium exertional level, and SVP of 2, unskilled. *Id.* Mr. Ford further testified that there are 367,000 laundry worker jobs available in the national economy, and 4,200 such jobs regionally. *Id.* Mr. Ford also testified to the availability

of the job of hand packer, DOT number 920.587-018, medium exertional level, SVP of 2, unskilled. *Id.* Mr. Ford also testified that there are 377,000 hand packer jobs available in the national economy and 1,400 such jobs regionally. *Id.* Mr. Ford testified to a third example, an egg sorter, DOT number 732.686-010, medium exertional level, SVP of 1, unskilled. AR at 67. Mr. Ford further testified that there are 112,000 egg sorter jobs available in the national economy and 1,100 such jobs regionally. *Id.*

The ALJ asked Mr. Ford a second hypothetical, assuming the same individual as in hypothetical number one, with the additional limitation that due to a combination of medical conditions and mental impairments this individual would be off task twenty (20) percent of the work day, and inquiring whether such limitations would be tolerated in employment. *Id.* Mr. Ford testified that none of the employers that he has worked with would tolerate such limitations. *Id.*

Plaintiff's counsel reiterated the ALJ's second hypothetical to Mr. Ford, but replaced the twenty (20) percent off task with two (2) hours off task. *Id.* at 67. Mr. Ford testified that a person with such restrictions would not be employable. AR at 67–68. Similarly, Plaintiff's counsel posed the same question with the individual off task between one (1) hour up to several hours, and up to two (2) or three (3) times a week. *Id.* at 68. Again, Mr. Ford testified that such an individual could not do any work. *Id.*

### 3. Lay Witness Testimony

On July 21, 2011, Dionne Lewis completed a Seizure Witness Report. AR at 253–54. Ms. Lewis reported that when Plaintiff gets stressed or has anxiety, he usually has a seizure. *Id.* at 253. Ms. Lewis further reported that sometimes Plaintiff feels them

coming and sometimes he does not. *Id*. Ms. Lewis stated that she witnessed a seizure that occurred in the evening while Plaintiff was outdoors doing yard work. *Id*. She further indicated that she had witnessed many seizures, and although they mostly occurred in the evening, they happened at all times during the day and varied in duration from three (3) to ten (10) minutes. *Id*. Ms. Lewis reported that plaintiff described the onset of a seizure as feeling badly and feeling an electric shock. AR at 253. Ms. Lewis indicated that anxiety and shaking were the first things that would cause her to think Plaintiff was going to have a seizure. *Id*. Ms. Lewis described Plaintiff as unconscious for approximately ten (10) minutes and nonresponsive during a seizure, his arms and legs shake, his face changes color, and his eyes shake and roll. *Id*. Ms. Lewis further stated that she has witnessed Plaintiff falling and injuring himself during a seizure, biting his tongue, crying out at the start of the seizure, losing bladder control, and body shakes. *Id.* Ms. Lewis also stated that Plaintiff sometimes hesitates and stares into space for short period without falling or shaking, and after a seizure he does not seem normal as if he is lost and cannot remember where he is at or what happened. *Id.* Ms. Lewis reported that after seizure Plaintiff is unable to speak, confused, and has obvious paralysis or weakness of the arms and legs. AR at 254. Ms. Lewis further reported that Plaintiff just started taking medication for the problem, and although the seizures are not daily, Plaintiff has trouble remembering things and is very forgetful. *Id.*

On the same date, Ms. Lewis completed a Function Report—Adult—Third Party regarding Plaintiff. *Id*. at 255–62. Ms. Lewis stated that she has known Plaintiff for twelve (12) years, and recently began helping him get to doctors and providing a roof

over his head. *Id*. at 255. Ms. Lewis reported that Plaintiff has restless nights and is up between 4 and 6 a.m.; and during the day drinks coffee; tries to do yard and house work; goes for walks; and does not sit still too long. *Id*. Ms. Lewis further reported that Plaintiff does not care for any other people or animals. AR at 256. Ms. Lewis noted that Plaintiff is unable to do concrete work, road construction, or rig work. *Id*. Ms. Lewis further noted that once Plaintiff lies down and starts to relax, he begins feeling electric shocks through his body. *Id*.

Ms. Lewis noted that Plaintiff has no problems with his personal care, and he does not need any reminders regarding the same. *Id*. at 256–57. Ms. Lewis further noted, however, that Plaintiff cannot remember whether or not he has taken his medication. *Id*. at 257. Ms. Lewis reported that Plaintiff can prepare his own meals as long as he is feeling okay, but if he forgets what he is doing, he becomes frustrated and does not finish. AR at 257. Ms. Lewis further reported that Plaintiff is more forgetful of where he puts things and what he is doing since becoming ill. *Id*. Ms. Lewis also reported that Plaintiff can do most things regarding household chores; however, when he becomes anxious or has a seizure he cannot function. *Id*. In her opinion, chores usually take longer than they should when Plaintiff is doing them. *Id*. Ms. Lewis also noted that Plaintiff has low self-esteem. *Id*.

Ms. Lewis reported that Plaintiff goes out daily and either walks or rides in a car. AR at 258. She further noted that while Plaintiff can go out alone, he cannot drive due to his seizures. *Id*. Ms. Lewis stated that Plaintiff goes to the store and shops for himself and for groceries; however, this activity takes longer than necessary and Plaintiff cannot

remember what he needs to get or what he is doing. *Id.*

Ms. Lewis listed Plaintiff's hobbies as fishing, camping, pool, television, and playing outdoor sports. *Id.* at 259. Ms. Lewis further reported that on good days he is able to do these things well, and on other days not at all. *Id.* Ms. Lewis opined that Plaintiff is scared to work and is embarrassed by his seizure condition. *Id.* Ms. Lewis stated that Plaintiff does spend time with others; however, he mostly stays to himself. AR at 259. Ms. Lewis further stated that Plaintiff must be reminded to call, go to appointments, take medication, and be reminded of what he is doing. *Id.*

Ms. Lewis described Plaintiff's family as very negative, and stated that Plaintiff does not like to be around people. *Id.* at 260. Ms. Lewis noted that Plaintiff's illness affects his standing, walking, talking, seeing, memory, completing tasks, concentration, understanding, follow instructions, and getting along with others. *Id.* Ms. Lewis additionally noted that when Plaintiff gets upset or nervous, he becomes shaky and is unable to concentrate or remember. *Id.* Ms. Lewis also reported that Plaintiff cannot follow written instructions without giving up. AR at 260. Ms. Lewis opined that Plaintiff is able to get along with authority figures and that he has not lost his job because of any issues with getting along with people. *Id.* at 261. Ms. Lewis further reported that Plaintiff does not handle stress or changes in routine well, and gives up in avoidance of stress or problems. *Id.* Ms. Lewis also reported that Plaintiff uses glasses for reading. *Id.* Ms. Lewis stated that she knows Plaintiff suffers from a lot of anxiety, depression, seizures, and headaches, as well as trouble concentrating and focusing. *Id.* at 262.

. . .

### 4. Plaintiff's Medical Records

On April 1, 2007, Plaintiff was seen at the San Juan Regional Medical Center emergency department. AR at 387–92. Plaintiff had been transported to the emergency department via EMS, with a possible seizure. *Id*. at 387. Plaintiff was noted to be confused, and unable to remember where he was when the seizure occurred, or answer questions appropriately. *Id*. Plaintiff was reported to have consumed half of pint of whiskey that day; however, he stated that he had only had one small drink and mild daily alcohol use. *Id*. at 387–88. Plaintiff also had blood work done. *Id*. at 391–92. Plaintiff's final diagnosis was probable seizure and alcohol abuse. AR at 389.

On April 9, 2009, Plaintiff was seen at the San Juan Regional Medical Center emergency department complaining of left eye pain. *Id*. at 375–86. Plaintiff reported that he had been working outside in the wind the previous day. *Id*. at 375, 380. Plaintiff was diagnosed with a corneal abrasion. *Id*. at 382–83. Plaintiff was treated and discharged home, with instructions to follow up with an ophthalmologist. *Id*. at 382, 385–86.

On October 8, 2010, Plaintiff was seen at the San Juan Regional Medical Center emergency department by Brett Ziercher, M.D. AR at 360–74, 393. Plaintiff stated "today is his birthday and he did meth as well as had a six pack of beer to drink." *Id*. at 360. Prior to arriving at the emergency department, Plaintiff had passed out. *Id*. Plaintiff was given an electrocardiogram ("EKG"), and Dr. Ziercher noted a borderline prolonged qt. *Id*. at 361–62, 372. Dr. Ziercher opined that follow up with cardiology was appropriate, and diagnosed Plaintiff with acute alcohol intoxication and heart block.

*Id.* at 362.  Plaintiff was discharged to home and directed to follow up with Robert Sprung, M.D.  AR at 362, 364.

On March 30, 2011, Plaintiff had blood work done, the results of which were unremarkable.  *Id.* at 322–23.  On May 2, 2011, Plaintiff underwent an electroencephalogram ("EEG").  *Id.* at 320–21, 326–27.  Stephen W. Thompson, M.D. noted that "[t]he record is abnormal because of spikes in the right central region in sleep." *Id.* at 321, 327.  Dr. Thompson further noted "[w]hat may be a single right central spike also occurs awake."  *Id.* Dr. Thompson found "[t]he record is considered to be suggestive of the possibility of an epileptic tendency with the right central spike focus."  AR at 321, 327.  Additionally, Dr. Thompson noted "the amplitude of the activity in the right central region is higher than that in the left, both asleep and awake . . . probably [] secondary to a skull defect in the right central region from previous surgery."  *Id.*  Dr. Thompson further found that during sleep "it can be discerned that there is some slowing in the right central region . . . [which] is non-specific and indicative of possible abnormality in this region and it is in the location of previous surgery following head trauma."  *Id.*

On July 4, 2011, Plaintiff was seen at the San Juan Regional Medical Center emergency department by Angela Mize, M.D.  *Id.* at 330–59, 394–96, 473–507.  Plaintiff "arrived by stretcher via ambulance from Street [sic] accompanied by EMT/paramedic[.]"  *Id.* at 330, 473.  Per the EMT, "police saw pt driving down the road and had blood on his face, pt states fell down or someone hit him, doesn't know, has been drinking[.]"  AR at 330, 473.  Plaintiff complained of a possible assault, with moderate pain, and the precipitating factors unknown.  *Id.* at 333, 476.  Plaintiff's associated

symptoms included nose pain, headache, and anxiousness. *Id.* Plaintiff suggested that someone "slipped him drugs." *Id.* Plaintiff's drug screen was presumptively positive for meth, amphetamine, and benzodiazepine. *Id.* at 335–36, 395, 478–79, 490. Plaintiff's chest x-ray was unremarkable. AR at 337–38, 397, 480–81, 492. Plaintiff underwent a computed tomography ("CT") scan of his head. *Id.* at 338–40, 481–82, 493, 514. Plaintiff's head CT showed "[c]hronic right frontal and right parietal infarcts[;] [r]ight parietal craniotomy appears to be old[;] [n]o ventricle dilation[;] [n]o mass effect; [n]o hemorrhage[;] [n]o extra axial fluid collection." *Id.* at 338, 339, 398, 481, 482, 493, 514. Plaintiff also underwent a CT scan of his maxillofacial sinus, which showed a "[n]asal bone fractures appeared to be acute[;] [n]o other fracture[;] [m]ild paranasal sinus mucosal thickening[;] [o]rbital contents unremarkable[;] [and] [n]o other finding." *Id.* at 339, 340, 399, 482, 483, 494, 515. Plaintiff's cervical spine CT indicated "[n]o fracture, dislocation, disc herniation, or epidural hematoma[;] [and] [n]o other finding." *Id.* at 341, 400, 484, 495. After treatment Plaintiff's condition was good, and he was discharged to home. AR at 342, 485. On July 18, 2011, Plaintiff was seen by Roy Addington, CNP at Presbyterian Medical Services. *Id.* at 403–04, 547–48. Plaintiff presented with seizure and anxiety. *Id.* NP Addington noted that Plaintiff had a seizure the week prior because he ran out of his prescription. *Id.* at 403. Plaintiff also reported daily suicidal ideation. *Id.* at 404, 548. NP Addington changed Plaintiff's medication to Tegretol and added clonazepam and accompanied him to behavioral health for intake. AR at 404, 548. On July 27, 2011, Plaintiff was again seen at the San Juan Regional Medical Center emergency department. *Id.* at 455–72. Plaintiff complained of a headache with "electric

shock feeling over entire body" and a loss of memory. *Id*. at 455, 458. Plaintiff reported his symptoms began one (1) week prior, described his pain at a six (6) out of ten (10), and described the pain as stabbing. *Id*. Plaintiff further described his pain as stabbing, sharp, and shooting, and reported blurred vision. *Id*. Plaintiff underwent another CT scan. AR at 459–60, 463, 513, 552. Robert Orbelo, M.D. reported a "right parietal craniectomy[;] [u]nderlying right parietal encephalomalacia[;] [r]ight frontal encephalomalacia[;] [n]o mass, hemorrhage, or extraaxial fluid collection[;] [and] [n]o change from 7/4/11." *Id*. Dr. Orbelo's impression indicated "[n]o acute process." *Id*. Brad Campbell, D.O. diagnosed Plaintiff with a headache and acute depression, and discharged him to home. *Id*. at 460–61.

On August 5, 2011, Plaintiff was seen by Timothy W. Henkels, CNP at Presbyterian Medical Services for an office visit. *Id*. at 543–46. Plaintiff was seen for medication refill, seizure, and back pain. AR at 543. NP Henkels noted that Plaintiff's seizures are aggravated by stress and that Plaintiff is a poor historian. *Id*. NP Henkels's physical examination of Plaintiff was generally unremarkable; however, NP Henkels noted Plaintiff's mild distress. *Id*. at 543–45. Regarding Plaintiff's psychiatric assessment, NP Henkels reported Plaintiff had a depressed affect; was negative for anhedonia; was anxious; did not exhibit compulsive behavior; did not behave appropriately for age; had a deficient fund of knowledge; had normal language; was not in denial; not euphoric; not fearful; did not have flight of ideas; was not forgetful; did not have thoughts of grandiosity; denied hallucinations; denied hopelessness; did not have increased activity; was having severely impaired remote memory; had no mood swings;

no excessive thoughts; no paranoia; had normal insights; exhibited normal judgment; normal attention span and concentration; did not have pressured speech; and did not have suicidal ideation. *Id*. at 545. NP Henkels also noted a moderately impaired short-term memory. *Id*. Plaintiff was given a prescription for tramadol and baclofen for lumbago. AR at 545.

On September 21, 2011, Sandra E. Eisemann, Ph.D. performed a psychological evaluation on Plaintiff. *Id*. at 406–12. Dr. Eisemann noted that Plaintiff was "referred for evaluation of headaches, seizures, anxiety and head trauma in the 1980s." *Id*. at 406. Dr. Eisemann noted that Plaintiff looked distressed during the evaluation and was a poor historian. *Id*. As background information, Dr. Eisemann reviewed a bloodwork report from July 19, 2011 and a report from PMS dated July 18, 2011. *Id*. Dr. Eisemann also reviewed Plaintiff's traumatic brain injury due to an assault with a tire iron to the right side of the head. AR at 406. Plaintiff "stated his main complaints were Seizures [sic], headaches[,] and anxiety." AR at 407. Plaintiff further stated that he "wants to work but cannot do so due to his physical conditions." *Id*. Plaintiff also reported poor memory and an inability to remember to take his medications. *Id*. Dr. Eisemann noted that Plaintiff's "seizure disorder began in 1980 after the brain injury and surgery." *Id*. Plaintiff told Dr. Eisemann that he was unable to do anything, felt worthless, and his concentration was poor. AR at 407. Plaintiff further reported "that the seizure disorder [wa]s the reason he cannot work." *Id*. Dr. Eisemann further noted that Plaintiff had a head trauma and surgery in the 1980s when he was hit with a tire iron and paralyzed on his left side for six months; however, Plaintiff does not remember anything about it. *Id*.

As a result, Plaintiff had "two surgeries, one to remove[] bone and blood clots and another to put a plate in his skull." *Id*. Dr. Eisemann noted Plaintiff's medications as baclofen for muscle pain; tramadol and two medications that he had not filled due to finances — Trazodone and carbamazepine. *Id*. Dr. Eisemann further noted that Plaintiff reported that "he was a bad alcoholic since he was 12 years old and stopped drinking 8 months ago." AR at 407. Dr. Eisemann described Plaintiff's work history as "pouring concrete, on the pipelines, and on an oil rig[,] . . . [laying] carpet[,] and [] labor." *Id*. at 408. Dr. Eisemann noted Plaintiff's general appearance as "a thin man who looked anxious and distressed." *Id*. Dr. Eisemann further noted that Plaintiff "was vague in his descriptions and said 'I don't know' often [,] . . . [and] seemed somewhat irritable during the interview." *Id*. Dr. Eisemann reported Plaintiff "oriented as to time, place, and person." *Id*. Dr. Eisemann described Plaintiff's short-term memory as poor, but not his long-term memory. AR at 408. Dr. Eisemann further reported that Plaintiff could not correctly remember three objects after five minutes, but was able to do a digit span forward and backwards. *Id*. Dr. Eisemann also reported that Plaintiff made no errors in the serial 7's; however, although he could spell the word WORLD correctly forward, he could not do it in the reverse. *Id*. Dr. Eisemann reported Plaintiff's fund of information as low average or below, intelligence as low average or below, and speech and language capabilities without problems. *Id*. at 409. Dr. Eisemann noted that Plaintiff felt depressed and was always worried. *Id*. Dr. Eisemann further noted that Plaintiff thinks of self-harm but did not have a current plan. AR at 409. Dr. Eisemann also noted that Plaintiff did not exhibit malingering or factitious behavior. *Id*. Dr. Eisemann described

Plaintiff's typical day as waking up; making coffee; fixing his bed; talking with his uncle; watching game shows on television; making sandwiches for meals; doing some cleaning and laundry; and going grocery shopping. *Id.* at 410. Dr. Eisemann noted that Plaintiff had significant dental problems, but did not have money for repairs. *Id.* Dr. Eisemann reported that Plaintiff stated his memory was not good, he loses interest in things easily, and does not finish them, and is highly distractible and will not stay task. *Id.* Plaintiff also stated that he was functioning better one year ago and now has no interest at all. AR at 410. Dr. Eisemann diagnosed Plaintiff with Anxiety Disorder not otherwise specified; Major Depressive Disorder, recurrent, moderate; and Alcohol Dependence (abstinent for eight months). *Id.* Dr. Eisemann reported Plaintiff's GAF score as 55–60. *Id.* at 411. Dr. Eisemann noted that it was "not clear how much of [Plaintiff's] cognitive issues are due to the head injury when he was twenty-nine years old and how much has been from alcohol abuse[,] [h]e continues to have seizures at this time as well." *Id.* Regarding Plaintiff's work capacity, Dr. Eisemann opined that Plaintiff could understand short and simple instructions, and is moderately limited in this area. *Id.* Dr. Eisemann further opined that Plaintiff could carry out simple instructions, but his attention and concentration was reported to be very poor, and he could not work without supervision due to his seizure disorder, resulting in a moderate to marked limitation in this area. AR at 411. Dr. Eisemann also opined that Plaintiff is rather irritable, but if his depression were treated he would be more apt to interact well with supervisors, peers, and the public, and is moderately limited in the area of social interaction. *Id.* Dr. Eisemann opined that Plaintiff could adapt to simple changes in the workplace and could recognize hazards, but

could not be depended upon to respond due to his seizure condition, and would also need to use public transportation to get to the workplace. *Id.* Dr. Eisemann further opined that if Plaintiff resumed drinking alcohol, it would greatly affect his ability to work. *Id.* Finally, Dr. Eisemann opined that Plaintiff could handle his own funds. *Id.*

On September 23, 2011, Plaintiff saw NP Henkels at Presbyterian Medical Services for an office visit. AR at 541–42. Plaintiff was seen for a medication refill. *Id.* at 541. NP Henkels reported Plaintiff's chronic problems as other convulsions; other symptoms referable to back; and insomnia, other. *Id.* Plaintiff's physical examination was otherwise unremarkable. *See id.* at 541–42. NP Henkels renewed Plaintiff's seizure medication and ordered labs regarding the same, and prescribed Vistaril for Plaintiff's insomnia. *Id.* at 542, 551.

On October 12, 2011, Plaintiff was again seen by NP Henkels for an office visit at Presbyterian Medical Services. AR at 538–40. Plaintiff was seen to discuss sleep medication. *Id.* at 538. Plaintiff reported that trazodone was ineffective and hydroxyzine was effective for two (2) days then ceased to be so. *Id.* NP Henkels noted Plaintiff's chronic problems as other convulsions; other symptoms referable to back; and insomnia, other. *Id.* NP Henkels's physical review of Plaintiff was otherwise unremarkable. *See id.* at 538–39. Plaintiff was given a sample of Ambien, as well as a behavioral health packet and told "that this was a very important part of getting his insomnia undercontrol [sic]." *Id.* at 539.

On November 4, 2011, Paul Cherry, Ph.D. reviewed Plaintiff's records and completed a Psychiatric Review Technique and Mental Residual Functional Capacity

Assessment. AR at 413–26. In his Psychiatric Review Technique, Dr. Cherry reported and RFC assessment was necessary based upon Plaintiff's affective and anxiety-related disorders. *Id.* at 413. Dr. Cherry found Plaintiff to have a medically determinable impairment of depression and anxiety. *Id.* at 416–17. Regarding "B" criteria, Dr. Cherry found Plaintiff to have a mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. *Id.* at 421. Dr. Cherry also reported that the evidence does not establish the presence of the "C" criteria. *Id.* at 422. Dr. Cherry summarized Dr. Eisemann's report. AR at 423. Dr. Cherry reported that Plaintiff was not significantly limited in his ability to remember locations and work-like procedures; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to ask simple questions or request assistance; to maintain socially appropriate behavior and to it here to basic standards of neatness and cleanliness; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. *Id.* at 424–25. Dr. Cherry further reported that Plaintiff was moderately limited in his ability to understand and remember very short and simple instructions; to carry out very short and simple instructions; to maintain attention and concentration for extended periods: to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at

- 24 -

a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. *Id*. Finally, Dr. Cherry reported that Plaintiff had marked limitations in his ability to understand and remember detailed instructions and to carry out detailed instructions. *Id.* at 424. Accordingly, Dr. Cherry opined that Plaintiff "has moderate limitations in understanding, remembering, and carrying out detailed instructions[,] . . . [as well as] moderate limitations in his ability to concentrate." *Id.* at 426. Dr. Cherry further opined that Plaintiff retained the functional ability to do simple tasks in a work setting environment. AR at 426.

On November 7, 2011, Bonnie Lammers, M.D. reviewed Plaintiff's medical records and completed a Physical Residual Functional Capacity Assessment. *Id.* at 427–32. Dr. Lammers noted Plaintiff's primary diagnosis as seizures. *Id*. at 427. Dr. Lammers found that Plaintiff had no exertional limitations. *Id*. at 428. Dr. Lammers further found that Plaintiff could never climb on ladders, ropes, or scaffolds. *Id*. at 429. Dr. Lammers also found that Plaintiff did not have any manipulative, visual, or communicative limitations. AR at 429–30. Regarding environmental limitations, Dr. Lammers found Plaintiff to be unlimited, except for hazards to which he is to avoid all exposure. *Id*. at 430. Dr. Lammers further noted that Plaintiff "is to avoid unprotected heights, uncovered bodies of water [,] and hazardous machinery due to [his history of] seizures and headaches." *Id*.

On November 10, 2011, Plaintiff was seen by NP Henkels at Presbyterian Medical Services for an office visit. *Id.* at 535–37. Plaintiff was seen for a medication refill of Vistaril and Ambien, which Plaintiff reported to be working well. *Id.* at 535. NP Henkels listed Plaintiff's chronic problems as other convulsions; other symptoms referable to back; insomnia, other; and anxiety state, unspecified. AR at 535. NP Henkels's neuro/psychiatric examination was positive for appropriate interaction, consolability, and psychiatric symptoms, but negative for difficulty concentrating. *Id.* at 536. Plaintiff's physical examination was otherwise unremarkable. *See id.* at 535–36. NP Henkels noted that Plaintiff was noncompliant his with medication regimen, and informed Plaintiff "that there would not be any refills from medical for these medications and that if he wanted to stay on them he would have to keep his appointment with [behavioral health]." *Id.* at 536.

On November 17, 2011, Plaintiff was seen at the San Juan Regional Medical Center emergency department by Angela Mize, M.D. *Id.* at 435–54, 549–50, 553–59. Plaintiff was brought to the emergency department via ambulance from his home after having a tonic-clonic seizure. AR at 435. Dr. Mize noted that the seizure began just prior to arrival, with sudden onset, and that Plaintiff also experienced headache. *Id.* at 435, 438, 554. Plaintiff claimed that he was compliant with his medication and had not been drinking alcohol. *Id.* Dr. Mize diagnosed Plaintiff was with having a grand mal seizure, suspected an underdose of his Tegretol, and adjusted the prescription accordingly. *Id.* at 441. Plaintiff was discharged home. *Id.*

On November 21, 2011, Plaintiff was seen at Presbyterian Medical Services

("PMS") for a behavioral health assessment. AR at 525–31. Plaintiff reported that he had been referred by Dr. Henkels for an assessment for anxiety and depression. *Id.* at 525. Plaintiff reported that Dr. Henkels had been treating his anxiety and depression for a couple of months and that his memory had been increasingly impaired over the past year. *Id.* Plaintiff also reported that he had pressure in his head, his neck hurt all the time, he felt that he was dying, and that he had lost several family members within the past year. *Id.* at 525, 530. Plaintiff recounted his history of depression and anxiety, seizures, and brain injury. *Id.* at 525. Plaintiff described his current symptoms as being depressed most of the day every day, insomnia, inability to concentrate, passive thoughts of death, frequent panic attacks, avoidance of noisy places with lots of lights, muscle tension, irritability, an inability to concentrate, and sleep disturbance. AR at 525. Plaintiff reported that he has abstained from alcohol use for one (1) year. *Id.* at 527. Plaintiff reviewed his history of DWIs; his family history; indicated that he wished he could go to work; and reported no hobbies and no income. *Id.* at 528–29. Plaintiff was diagnosed with major depression moderate; mood disorder due to a general medical condition (with depressive features); panic disorder with agoraphobia; anxiety disorder due to a general medical condition (TBI); alcohol dependence in full sustained remission; and amphetamine dependence in full sustained remission. *Id.* at 530. Plaintiff was further diagnosed with traumatic brain injury, seizures, and neck pain; problems with primary support; problems related to the social environment as he is socially isolated; occupational problems due to his inability to work due to seizures; and economic problems as he has no income source. *Id.* Plaintiff's diagnosis also included a GAF

score of 49.  AR at 530.

On December 5, 2011, Plaintiff saw Morgan J.  Manulik, P.A.-C. for a neurologic exam.  *Id.* at 510–12.  PA Manulik's diagnostic impression included seizure disorder, tonic-clonic; depression; sleep disturbances; history of traumatic brain injury; and history of anxiety.  *Id.* at 510.  PA Manulik noted Plaintiff's chief complaint as a seizure disorder with associated left-sided paresthesia.  *Id.*  PA Manulik summarized Plaintiff's medical history noting his seizure disorder, depression, anxiety, and traumatic brain injury.  *Id.*  at 510–11.  Plaintiff denied any alcohol or illicit drug use.  AR at 511.  PA Manulik's review of systems was unremarkable, as was his physical exam.  *Id.* at 511–12.  PA Manulik found Plaintiff alert and oriented to person, place, and date; mentation intact with appropriate memory function; mood and affect unremarkable; and no aphasia.  *Id.* at 512.  PA Manulik reported Plaintiff's pupils were equal, round, and reactive to light and accommodation; extraocular movements were intact and conjugate with no nystagmus appreciated; visual fields intact to finger confrontation; facial movements and sensation symmetric; tongue midline; symmetrical elevation of palate; and sternocleidomastoid and trapezius function intact.  *Id.*  PA Manulik further reported that Plaintiff did not have any peripheral nerve or dermatome pattern of sensory deficit.  *Id.*  PA Manulik also reported that Plaintiff's muscle bulk and tone were symmetric with strength five out of five throughout.  AR at 512.  Plaintiff was able to perform rapid alternating movements symmetrically without slowing; showed no cerebellar tremor on finger-to-nose testing; and was able to perform a tandem gait.  *Id.*  Further, Plaintiff's reflexes were symmetric. *Id.*

On December 7, 2011, Plaintiff again saw NP Henkels at Presbyterian Medical Services for an office visit. *Id.* at 532–34. Plaintiff was seen for his seizure, as well as a medication refill. *Id.* at 532. Plaintiff's emergency department visit was noted, as was his increased Tegretol prescription. AR at 532. Plaintiff reported taking the medication as prescribed. *Id.* NP Henkels noted that Plaintiff was a poor historian at this visit. *Id.* NP Henkels noted Plaintiff's chronic problems as other convulsions; other symptoms referable to back; insomnia, other; and anxiety state, and specified. *Id.* NP Henkels described Plaintiff's level of distress as awake and alert, without acute distress. *Id.* at 533. The examination of plaintiff was otherwise unremarkable. *See* AR at 532–34.

On October 4, 2012, Plaintiff was seen by Sasi Krishna Ghanta, M.D. at El Rio Community Health Center. *Id.* at 639–45. Dr. Ghanta reported Plaintiff's appointment was to establish care; for medication refills; and treatment for seizure, insomnia, back pain, and anxiety. *Id.* at 639. Plaintiff reported that his last seizure episode was approximately four (4) months prior; he sometimes experiences an electrical sensation prior to the seizure episode; he sometimes has postictal confusion; and described his symptoms to include an altered level of consciousness, aura, drooling, and urinary incontinence. *Id.* Plaintiff further reported having anxious and fearful thoughts; difficulty falling asleep; difficulty staying asleep; fatigue; and feelings of guilt, as well as moderate, persistent, lower back pain. *Id.* Plaintiff also stated that he was not taking trazodone as it was making his insomnia worse and giving him headaches. AR at 639. Dr. Ghanta's review of Plaintiff's systems was generally unremarkable, but positive for fatigue; altered level of consciousness; anxiety; aura; difficulty initiating sleep; difficulty

maintaining sleep; and drooling. *Id.* at 640. Dr. Ghanta's physical examination of Plaintiff was also generally unremarkable. *Id.* at 641–42. Dr. Ghanta noted that Plaintiff did not have any back tenderness, straight leg raise elicited low back pain only, normal strength in both lower limbs, and kyphosis present. *Id.* at 641. Regarding Plaintiff's psychiatric examination, Dr. Ghanta reported he was oriented to time, place, person, and situation; had a depressed affect; was negative for anhedonia; was not agitated; was anxious; did not exhibit compulsive behaviors; behaved appropriately for age; had normal knowledge; had normal language; was not in denial; was not euphoric; was not fearful; did not have flight of ideas; was not forgetful; did not have thoughts of grandiosity; denied hallucinations and hopelessness; did not have increased activity; had no mood swings; had no obsessive thoughts; did not have paranoia; had normal insights; exhibited normal judgment; had normal attention span and concentration; did not have pressured speech; and did not have suicidal ideation. AR at 642. Dr. Ghanta further reported that Plaintiff did not demonstrate the appropriate mood or affect and was depressed. *Id.* Dr. Ghanta's assessment and plan included medications for Plaintiff's seizures and low back pain, bloodwork, and a referral to behavioral health. *Id.*

On October 11, 2012, Plaintiff was referred to Southern Arizona Mental Health Corporation ("SAMHC") by El Rio Community Health Center for a serious mental illness ("SMI") evaluation. *Id.* at 560–601. Rainier Diaz, M.D. diagnosed Plaintiff with major depressive disorder recurrent moderate; panic disorder without agoraphobia; seizure disorder; other neurological disorders; economic, primary support, healthcare, and occupational problems; and a GAF score of 42. *Id.* at 571, 582–83. A urine drug screen

was performed with negative results. *Id.* at 573, 588, 593, 594. Plaintiff reported his last alcohol use as one (1) year prior. AR at 574, 580, 589. Plaintiff further reported his last seizure was two (2) months prior and he was currently suffering from severe neck and lower back pain. *Id.* at 574, 586, 580. Plaintiff's mental status exam reported his speech to be normally responsive; affect was appropriate to thought content; mood depressed and hopeless; thought process was logical and coherent; thought content included preoccupations, suicidal ideation, and depressive; eye contact was culturally appropriate; self-concept showed low self-esteem; Plaintiff was oriented to person, place, time, and situation; motor was restless; intelligence was estimated to be average; impulse control was poor; judgment was fair; insight was fair; and memory demonstrated Plaintiff could not recall information at times. *Id.* at 580–81. Judith Garcia, BHT completed a Seriously Mentally Ill Determination form for Plaintiff. *Id.* at 598–99. Ms. Garcia noted Plaintiff's history of depression and anxiety and GAF score of 42. *Id.* at 598. Ms. Garcia's primary recommendation of functional criteria noted a risk of serious harm to self or others; and affective disruption causes significant damage to the person's education, livelihood, career, or personal relationships. AR at 598–99. Regarding Plaintiff's capacity to perform the present major role function in society, Ms. Garcia noted a major disruption of role functioning; and an inability to work, attend school, or meet other developmentally appropriate responsibilities. *Id.* at 599. Catherine S. Laughlin Psy.N.P. found Plaintiff to have met SMI criteria. *Id.* at 600. After this assessment, Plaintiff began treatment with COPE Community Services. *See id.* at 602–05.

On October 18, 2012, Plaintiff again saw Dr. Ghanta for an office visit. AR at

635–38.  The appointment was a follow-up, as well as a check-up regarding Plaintiff's sore throat.  *Id*. at 635.  Plaintiff reported that he had been seen by Dr. Diaz at SAMHC, and had a follow-up appointment scheduled.  *Id*.  Dr. Ghanta noted Plaintiff's chronic problems as insomnia, anxiety state, pain in lower back, seizure disorder, and depression. *Id.*  Dr. Ghanta's examination showed Plaintiff had a fever, nasal drainage, sore throat, and cough.  *Id*. at 636.  Dr. Ghanta assessed and acute upper respiratory infection, acute sinusitis, depression, and low back pain.  AR at 637.  Dr. Ghanta prescribed amoxicillin for Plaintiff's cold.  *Id*.  On October 26, 2012, Plaintiff underwent an initial intake at COPE Community Services and a Recommended Crisis Plan was created.  *Id*. at 611–13, 616.  Plaintiff reported having recently moved from New Mexico and that he had been sober from alcohol for eight (8) months.  *Id*. at 616.  Louis Gall, BHT reported Plaintiff to have limited insight into his presenting problem and that he deferred to his wife numerous times.  *Id*.

On November 7, 2012, Plaintiff underwent a psychiatric diagnostic interview examination with Francisco Garcia, M.D.  AR at 620.  Dr. Garcia reported that Plaintiff's appearance was casual; concentration was poor; affect was restricted; speech was normal; psychomotor was retarded; mood was depressed; insight was fair; and judgment was fair. *Id*.  Dr. Garcia further reported that Plaintiff denied any delusions, hallucinations, and homicidal or suicidal ideations and noted Plaintiff to be oriented ×3.  *Id*.  Dr. Garcia noted that Plaintiff had a history of grand mal seizures, recurrent episodes of depression, and alcohol dependence from which he had been sober for seven (7) months.  *Id*.  Dr. Garcia further noted that Plaintiff had been prescribed amitriptyline and citalopram, but

quit taking them because the medication made him feel suicidal. *Id*. Dr. Garcia also noted that Plaintiff had been given Lorazepam, but had run out. AR at 620. Dr. Garcia diagnosed recurrent alcohol dependence in partial remission and prescribed sertraline and Lorazepam. *Id*.

On December 10, 2012, Plaintiff saw Dr. Garcia for pharmacologic management. *Id*. at 626. Dr. Garcia reported Plaintiff's appearance was casual; concentration was fair; affect was apprehensive; speech was normal; psychomotor was neutral; mood was anxious; insight was fair; and judgment was fair. *Id*. Dr. Garcia further reported that Plaintiff denied delusions; hallucinations; and homicidal or suicidal ideation. *Id*. Dr. Garcia noted Plaintiff to be oriented ×3. AR at 626. Plaintiff reported that he was still feeling anxious when going out and being around people, and complained of insomnia. *Id*. Dr. Garcia discontinued Lorazepam and switched to diazepam and increased Plaintiff's sertraline dosage. *Id*. On December 18, 2012, Plaintiff saw Dr. Ghanta for an office visit. *Id*. at 631–34. Plaintiff's visit included a follow-up for seizure, that he reported having a couple weeks prior. *Id*. at 631. Plaintiff described the seizure as a sudden shock like sensation with confusion and blacking out for a few seconds, but without jerking of arms and legs or incontinence. AR at 631. Plaintiff confirmed that he was taking the lamotrigine and carbamazepine. *Id*. Dr. Ghanta's physical examination was unremarkable. *Id*. at 632–33. Dr. Ghanta's assessment and plan included continuing medications for Plaintiff's seizure disorder and a neurology referral; continuing Naprosyn and starting gabapentin for his low back pain; and following up at SAMHC for his depression. *Id*. at 633.

On February 4, 2013, Plaintiff was seen by Dr. Garcia at COPE for a medication follow-up. *Id.* at 681–82. Plaintiff reported that he was doing well, but that the diazepam was too strong and making it difficult to wake up in the morning. AR at 681. Dr. Garcia reported Plaintiff's speech was normal; memory was mildly impaired; thought process was concrete and simple; concentration was poor; fund of knowledge was mildly limited; judgment was limited; insight was limited; mood was appropriate for the situation; affect was appropriate; language was normal; and thoughts were normal. *Id.* Dr. Garcia further reported Plaintiff was oriented ×3 and compliant with medications. *Id.* Dr. Garcia also reported that Plaintiff denied delusions, hallucinations, and homicidal or suicidal ideation. *Id.* Dr. Garcia decreased Plaintiff's diazepam dosage and continued his sertraline. *Id.* at 682. Dr. Garcia reported Plaintiff's Global Risk Assessment as moderate, meaning one or more chronic illnesses with mild exacerbation or two or more stable chronic illnesses. AR at 682.

On April 17, 2013, Plaintiff followed up with Dr. Garcia at COPE. *Id.* at 672–73. Plaintiff reported some mood improvement, but was still feeling anxious and did not like the way Valium made him feel. *Id.* at 672. Dr. Garcia reported Plaintiff's speech was normal; memory was age-appropriate; thought processes were logical and coherent; concentration was fair; fund of knowledge was age-appropriate; judgment was fair; insight was fair; mood was anxious; affect was apprehensive; and language was normal. *Id.* Dr. Garcia further reported that Plaintiff was oriented ×4 and did not have any abnormal or psychotic thoughts. *Id.* Dr. Garcia also noted that Plaintiff denied delusions, hallucinations, and homicidal or suicidal ideations. *Id.* Dr. Garcia reported Plaintiff was

compliant with his medication. AR at 672. Dr. Garcia discontinued Valium and started a prescription for clonazepam and continued the sertraline. *Id*. at 673. Dr. Garcia reported Plaintiff's Global Risk Assessment as low, meaning one stable chronic illness, such as well-controlled depression. *Id*.

On April 22, 2013, Plaintiff was seen by Dr. Ghanta for an office visit. *Id.* at 653–60. Plaintiff's appointment included a seizure follow-up, as well as ongoing treatment for his chronic conditions, including anxiety, depression, insomnia, low back pain, and seizure disorder. *Id*. at 657. Plaintiff reported that he had not seen a neurologist due to finances and stated that he had stopped taking gabapentin due to its side effects. AR at 657. Dr. Ghanta's examination was unremarkable. *Id*. at 658–59. Dr. Ghanta reported that Plaintiff's low back was without tenderness, straight leg raise was negative, there was normal strength in both lower limbs, and plaintiff was able to walk on his tip toes and heal. *Id*. at 659. Dr. Ghanta's assessment and plan included instructions for Plaintiff to continue medications and use a heating pad for low back pain; continue medications for his seizure disorder, as well as a discussion regarding fall and seizure precautions; and a follow up with his psychiatrist for depression. *Id*. at 655, 659–60. On the same date, Plaintiff underwent diagnostic radiology of his lumbosacral spine. *Id.* at 653. Per Granstrom, M.D. reported five (5) normal lumbar vertebrae with the intra-vertebral disc spaces preserved. AR at 653. Dr. Granstrom further noted small osteophytes anteriorly on L3 and 4 suggesting mild degenerative changes and no posterior osteophytes. *Id*. Dr. Granstrom also noted normal facet joints and intravertebral foramina, and unremarkable adjacent soft tissues. *Id*.

On May 13, 2013, Plaintiff saw Dr. Ghanta for a follow-up visit regarding his chronic conditions. *Id.* at 647–50. Dr. Ghanta reported Plaintiff's lower back pain and seizure disorder were controlled and directed the use of a heating pad and continuation of medications. *Id.* at 647. Dr. Ghanta further noted Plaintiff's major depressive disorder was fairly controlled, and directed follow-up at COPE. AR at 647.

## II. STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v.*

*Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

## III.   ANALYSIS

### A.   The Five-Step Evaluation

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). This process is defined as follows: Step one asks is the claimant "doing substantial gainful activity[?]" If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]" If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1. If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work. If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience. If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2012, and was not engaged in

substantial gainful activity since his amended alleged onset date of January 1, 2010.[3] AR at 13. At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: seizures; depression; headache; anxiety disorder; insomnia; history of drug and alcohol abuse in full-sustained remission (20 CFR 404.1520(c) and 416.920(c))." *Id.* At step three, the ALJ found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." *Id.* at 14. Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant can never climb ropes, ladders, or scaffolds; must avoid all exposure to unprotected heights; is limited to simple, routine, and repetitive tasks; can only occasionally interact with the public; can only occasionally interact with co-workers; and must not be in an isolated work area." AR at 16. At step four, the ALJ found that "[t]he claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965)." *Id.* at 20. Accordingly, at step five, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a))." *Id.*

Plaintiff asserts that the ALJ erred in failing to consider all of Plaintiff's

---

[3] *See* FN 2, *supra.*

impairments in posing a hypothetical question to the vocational expert, improperly imposing her own medical opinion, failing to fully consider Plaintiff's statements and testimony about the limiting effects of his impairments, and in weighing the reports of Plaintiff's activities of daily living. Pl.'s Opening Br. (Doc. 19) at 9, 12–22.

### B. *Plaintiff's Symptoms*

#### 1. Legal standard

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'" *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014). Further, "the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282 (citations omitted); *see also Trevizo v. Berryhill*, — F.3d —, 2017 WL 4053751, *9 (9th Cir. Sept. 14, 2017). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282). "[I]f the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony

about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and convincing" requirement had been excised by prior Ninth Circuit case law). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

"Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and 'unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment.'" *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)); *see also Ghanim*, 763 F.3d at 1163. The Ninth Circuit Court of Appeals has "repeatedly warned[, however,] that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016 (citations omitted). Furthermore, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen*, 80 F.3d at 1287 n. 7 (citations omitted). The Ninth Circuit Court of Appeals has noted:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Garrison*, 759 F.3d at 1016 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)) (alterations in original). "While ALJs obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must *in fact* constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard." *Id.* at 1018 (emphasis in original) (discussing mental health records specifically). "Inconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination. *Burrell*, 775 F.3d at 1137 (citing *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

### 2. ALJ findings

Here, the ALJ properly delineated the two-step process for assessing Plaintiff's symptom testimony. AR at 16. The ALJ then found that Plaintiff's "subjective allegations are out of proportion to the objective medical evidence." *Id.* at 19.

### a. Medication non-compliance

The ALJ stated that "despite the complaints of allegedly disabling seizure symptoms, there is evidence the claimant has not been entirely compliant in taking prescribed medications[;] [t]he claimant reported he experienced a seizure after he ran out of medications during a visit to Farmington on July 18, 2011." AR at 19. "Failure to

follow prescribed treatment may 'cast doubt on the sincerity of the claimant's pain testimony.'" *Trevizo v. Berryhill*, — F.3d —, 2017 WL 4053751, *11 (9th Cir. Sept. 14, 2017) (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). A review of the record, however, shows that Plaintiff is generally compliant with his medication. AR at 435, 438, 441, 536, 672, 681. Moreover, on the same note indicating that Plaintiff's seizure was a result of running out of medication, CNP Addington reported that Plaintiff was having daily suicidal ideation and accompanied him to behavioral health for intake. *Id.* at 404, 548. Additionally, Plaintiff experienced a grand mal seizure while on his seizure medication. *Id.* at 435.

Furthermore, "[d]isability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds." *Trevizo*, 2017 WL 4053751 at *11 (quoting *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995)). The record reflects that Plaintiff had not filled two of his prescriptions due to cost and similarly foregone needed dental work. AR at 407, 410. The single data point chosen by the ALJ with regard to Plaintiff's medication compliance does not support a broader finding of unreliability. *See Garrison*, 759 F.3d at 1018.

### b. Headaches

The ALJ stated "[r]egarding the claimant's alleged headaches, a CT of the claimant's head taken on July 27, 2011 was negative and a physical examination showed no significant abnormalities." AR at 19. Plaintiff is not required to "produce objective medical evidence of the pain or fatigue itself, or the severity thereof." *Garrison*, 759 F.3d at 1014 (quotations and citations omitted). Moreover, Plaintiff's CT scan from July

4, 2011—twenty-three (23) days prior—indicated "[c]hronic right frontal and right parietal infarcts[.]" AR at 338, 339, 398, 481, 482, 493, 514. Additionally, Dr. Orbelo read and wrote the reports on both scans, which were close in time. *See id.* at 338, 339, 398, 459–60, 463, 481, 482, 493, 513, 514, 552. Plaintiff's traumatic brain injury and seizure disorder are well documented with evidence that headaches are associated with the same. As such, the ALJ did not point to any specific, clear and convincing reason for discounting Plaintiff's testimony regarding the severity of his headaches. *See Lingenfelter*, 504 F.3d at 1036.

### c. Inconsistent statements

The ALJ noted that "the claimant has made inconsistent statements regarding matters relevant to the issue of disability." AR at 19. The ALJ pointed to two instances in which Plaintiff's statements regarding his use of illicit drugs were inconsistent with the medical record. *Id.* Inconsistent or dishonest statements regarding past drug and alcohol use are proper grounds for discounting a claimant's testimony. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002). The Court finds, however, that "[t]his does not constitute substantial evidence supporting a finding that [Plaintiff's] symptoms were not as severe as [he] testified, particularly in light of the extensive medical record objectively verifying his claims." *Trevizo*, 2017 WL 4053751, *12.

### d. Conclusion

Based upon the foregoing, the Court finds that the ALJ failed to provide specific, clear and convincing reasons for discounting Plaintiff's testimony which are supported by substantial evidence in the record. *See Lingenfelter*, 504 F.3d at 1036; *Tommasetti v.*

*Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008).

## C.    *Remand for Further Proceedings*

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (*citing Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)). Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke,* 379 F.3d at 593 (citations omitted). Where the test is met, "we will not remand solely to allow the ALJ to make specific findings. . . . Rather, we take the relevant testimony to be established as true and remand for an award of benefits." *Id.* (citations omitted); *see also Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1995). "Even if those requirements are met, though, we retain 'flexibility' in determining the appropriate remedy." *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014).

Here, the ALJ committed legal error in rejecting Plaintiff's symptom testimony. The Court finds that remand is appropriate in this case. The ALJ is instructed to reassess Plaintiff's symptom testimony, as well as the lay witness testimony which was discounted, in part because of the same. *See* AR at 20. The ALJ is further instructed to

reassess Plaintiff's activities of daily living and the limitations that they impose based on her revised analysis of Plaintiff's symptoms. Additionally, reassessment of Plaintiff's testimony may impact the VE testimony and require additional inquiry. *See Matthews v. Shalala,* 10 F.3d 678, 681 (9th Cir. 1993) ("[i]f a vocational expert's hypothetical does not reflect all the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy." (internal quotation marks and citation omitted)). Finally, the ALJ shall correct Plaintiff's alleged onset date based upon the administrative record.

## V. CONCLUSION

In light of the foregoing, the Court REVERSES the ALJ's decision and the case is REMANDED for further proceedings consistent with this decision.

Accordingly, IT IS HEREBY ORDERED that:

1) Plaintiff's Opening Brief (Doc. 21) is GRANTED;

2) The Commissioner's decision is REVERSED and REMANDED;

3) Upon remand, the Appeals Council will remand the case back to the ALJ on an open record; and

4) The Clerk of the Court shall enter judgment, and close its file in this matter.

Dated this 21st day of September, 2017.

_____
Honorable Bruce G. Macdonald
United States Magistrate Judge